No. 44,405

STATE OF KANSAS, *Appellee,* v. CURTIS L. MILOW, *Appellant.*

(433 P. 2d 538)

Opinion filed November 13, 1967.

*Paul L. Gray,* of Wichita, argued the cause and was on the brief for the appellant.

*Donald Foster,* Deputy County Attorney, argued the cause, and *Robert C. Londerholm,* Attorney General, and *Keith Sanborn,* County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a criminal action in which the defendant was charged in an information with second degree burglary and larceny contrary to the provisions of G. S. 1949 (now K. S. A.) 21-515 and 21-524. He was tried before a jury and convicted; thereafter he was sentenced by the trial court pursuant to the habitual criminal act to fifteen years on each count, the sentences to run concurrently. Appeal has been perfected to this court specifying trial errors.

The overall question presented is whether a confession made by

the appellant while in custody and prior to trial was properly admitted into evidence before the jury.

On the 13th day of February, 1964, Curtis L. Milow (appellant) was arrested by police officers for the city of Wichita in the home of Mr. and Mrs. Ernest E. Johnson of 1134 North Green Street. The Johnsons had previously left home expecting a visitor, leaving the porch light on and a note in the door saying they would be back in half an hour. Upon returning they saw the porch light was out and became suspicious. Thereupon Mr. Johnson turned out the car lights, and upon coasting to a stop saw a man standing inside the front door. Mr. Johnson ran into the house and the intruder fled to the back part of the house. Mr. Johnson obtained assistance from the next door neighbor, and they kept watch on the outside of the house until the police arrived. One officer saw the appellant in a basement window and held him at bay while another went into the house and made the arrest, taking the appellant into custody.

Missing from the Johnsons' home was a portable television set and a water cooler.

The appellant was taken to the police station where he was booked for parole violation and burglary.

Upon being placed in the city jail the appellant was permitted to telephone his parents. After talking with members of his family, he asked to talk to his sister's boyfriend, Irvin Ward, who was visiting in his parents' home. He told Ward to pick up and dispose of a television set he had hidden behind a house in the area of the Johnsons' home, so he would not get in further trouble with the law. Ward conveyed this information to the police, not wishing to become involved in a criminal situation, and so testified at the trial.

On the 14th day of February, 1964, the appellant's parole from the Police Court of the city of Wichita was revoked, and he was ordered to serve a sentence at the City Prison Farm previously imposed in an assault case.

From that time until the 7th day of April, 1964, he was seen on four or five occasions by police detectives who interrogated him at the Prison Farm and also at the police station about the burglary and larceny committed in the Johnson home. He denied committing the offenses repeatedly until the 7th day of April, 1964, when a taped confession was taken from him concerning the offenses which he had been repeatedly questioned about by the Wichita police department while at the Prison Farm.

In view of the limited scope of the issue presented on appeal a discussion of procedural matters leading to the appellant's conviction is immaterial, except to the extent hereafter noted.

The only error argued by the appellant in his brief is that the trial court erroneously admitted the alleged confession of the appellant into evidence because: (a) he was not effectively apprised of his constitutional rights; (b) the alleged confession was made after promises and duress and was not voluntary; and (c) the trial court permitted the confession to go to the jury and be admitted into evidence without predetermining its voluntary nature.

The admissibility of confessions in evidence is covered by the rules of evidence embodied in our statutes. K. S. A. 60-460 provides in part:

"Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence and inadmissible except:

. . . . . . . . . . .

"(f) *Confessions.* In a criminal proceeding as against the accused, a previous statement by him relative to the offense charged if, and only if, the judge finds that the accused when making the statement was conscious and was capable of understanding what he said and did, and that he was not induced to make the statement (1) under compulsion or by infliction or threats of infliction of suffering upon him or another, or by prolonged interrogation under such circumstances as to render the statement involuntary, or (2) *by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person whom the accused reasonably believed to have the power or authority to execute the same;"* (Emphasis added.)

The thrust of the appellant's argument is that the taped confession, which the trial court admitted into evidence, was inadmissible because it was involuntary and came within the exclusionary rule of the above statute (particularly the emphasized portion), and the trial court failed to make a predetermination of the voluntary nature of the confession out of the presence of the jury.

When the taped confession was offered into evidence as state's exhibit No. 1, Detective Moffit was on the witness stand and the appellant objected to its admission.

Prior to the appellant's objection Detective Moffit had testified that he explained the appellant's constitutional rights to him prior to taking the taped statement and his right to an attorney. He further testified that he advised the appellant the taped recording could be reproduced at a later date in a court of law by a recording machine and used as evidence against him. He testified the state-

ments made by the appellant were voluntary and willing on the appellant's part. He made further qualifying remarks with respect to the tape recording device and the tape in establishing the accuracy of the reproduction of the confession.

The court then, out of the presence of the jury, gave counsel for the appellant an opportunity to ask Detective Moffit any preliminary questions he had. This questioning by counsel for the appellant went further into the advice given the appellant with respect to his constitutional rights—that he did not have to make any statements at all, that any statement he did make could be used against him in court, and that he had a right to have an attorney.

He testified the appellant expressed no desire to have an attorney, saying "I don't need counsel." Detective Moffit did not recall making a statement to the appellant that "You'd be better off without counsel." Detective Moffit further testified that "every time we talked to him" the appellant was advised of his right that he did not have to make a statement.

Extended examination of Detective Moffit by counsel for the appellant disclosed that he advised the appellant of his rights before the tape was taken and again advised him while the tape was being made. Thereupon counsel for the state moved the admission of exhibit No. 1 as the confession of the appellant without further delay. After some argument with counsel for the appellant the court stated:

"The Court: I have heard nothing to this point that would indicate that this statement was not voluntary. You may ask him any preliminary questions that you wish. That's the purpose of excusing the Jury.

"Mr. Ward: Your Honor, the answers that I would get from this man is strictly limited to just exactly what he has testified to, and that is that what happened on this particular day, April the 7th, I can't go in to him about something that has occurred before this time, or any factors that may affect the voluntariness or the involuntariness of this confession? I can't get it from him because he doesn't know.

"The Court: All right. Then anything that you go into like that I think would be defensive matter. It goes to the weight, rather than the substance.

"Mr. Ward: Well, it's true that it perhaps does go to the weight rather than the substance, but then on the other hand, Your Honor, here we are involved with a statement that amounts to a confession. A confession perhaps of guilt, we'll say. And certainly the methods used to extract this particular confession, or the methods used to obtain it would certainly be important as far as to this Court to inquire into, or to allow evidence to be submitted.

"The Court: The man who took the statement is on the stand. You may question him. I have given you—

"Mr. Ward: I am repeating myself, Your Honor, when I say that I am

limited. This man, he only talked to this man on April 7th. I can't go in to him with what happened prior to April the 7th.

"THE COURT: Do you wish to call any other witnesses?

"MR. WARD: Yes, I would. I'll call a witness here.

"THE COURT: Who do you wish to call?

"MR. WARD: I would like to call Mr. Taylor right now.

"THE COURT: What would you expect to establish by his testimony?

"MR. WARD: I would like to know from Mr. Taylor how many times this man had been questioned while he was over there on the City Prison Farm. I'd also like to find out if I possibly can, from either Mr. Moffit or Mr. Taylor, why this man was placed on the Prison Farm; I mean—

"THE COURT: He has already testified to that.

"MR. WARD: I beg your pardon?

"THE COURT: He has already testified to that.

"MR. WARD: On a parole violation?

"THE COURT: Yes.

"MR. WARD: Now, we know that. That's a matter of record, Your Honor, that this man was placed on a prison farm as a result of a parole violation. But I'd like to inquire into, was this parole violation a request made by the—I mean this man being incarcerated on this parole violation, was it a request made by the detectives—

"THE COURT: I can't see that that has anything to do with the admissibility of this tape recording.

"MR. WARD: And also I'd like to—

"THE COURT: Let me ask you on the record, do you have any evidence whatsoever that this was not a voluntary statement? If you do, I'll be glad to hear it.

"MR. WARD: Yes, Your Honor, I do have.

"THE COURT: All right.

"MR. WARD: That this was not a voluntary statement on the part of this man. And I'll place the man himself up there on the stand.

"THE COURT: This isn't the proper time to do it."

The substance of the trial court's ruling as further indicated by the record was that any matter which the appellant had to offer challenging the voluntary character of the confession was "defensive matter and the Jury will hear it at the proper time." Counsel for the appellant thereupon made an objection for the record and briefly argued the points decided in *Jackson v. Denno*, 378 U. S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774, 1 A. L. R. 3d 1205.

The jury was recalled, the tape recorded confession was admitted into evidence, and by machine the confession was put in evidence for the court and jury.

The tape recording constituted a confession by the appellant, with the exception that it disclosed a television set and stereo were taken and not a television set and water cooler, as charged in the information and established by the other evidence in the record.

Detective Moffit on cross examination testified the appellant was under the impression the water cooler taken out of the Johnson home was a stereo. He further testified on cross examination that shortly after the tape recorded statement was taken from the appellant, the appellant was released from the Prison Farm and transferred to the County Jail. He further testified at no time to his knowledge had the items which were taken from the Johnson home been recovered.

In due course of the trial the appellant took the witness stand on his own behalf and testified in substance that he had mistaken the Johnson home, which had a porch light burning, for the home at which he was calling upon a girlfriend for the first time, who advised him she would leave the porch light on so he could find the place. He further testified that detectives from the Wichita police department came out to the Prison Farm to pick him up four or five times for questioning, and that the advice he received was that he:

"Was going to get life imprisonment if I didn't help them clean up this case and tell them what I knew about it. And I told them well, I said, 'If I am going to get life anyway, I am not going to send myself up for nothing.' I said, 'You will just have to say I did it and prove it because I am not going to admit I did something I didn't do.' And they come back out again and questioned me and well, they kept on saying, 'We know you did it.' And they had another guy in in there and he laid it out in detail to how he told them I did it. And he said, 'Isn't this right, Curtis, isn't this the way you did it?' And I said, 'No, I don't know anything about it.' And then they come and got me again and they said if I didn't co-operate with them this time they wasn't going to bother with me no more, they was going to make sure I had 150 days out there on the P Farm, and I did 60 of them. And they say, 'Well, if you will come in and make confession that we wouldn't ask for—the habitual criminal act on you, and we will get you out of this P Farm and send you to the County and get you on up there in Lansing.' So I said, 'Well, if you— and then I don't know which one told me this, but he said, 'If you don't co-operate you will do 150 days.'

"MR. VAUGHN: Just a minute, I think we should know who said what and when it was.

"THE COURT: Yes, I think so.

"MR. VAUGHN: Who was present?

"A. Well, it was the lieutenant of the detectives, a great big guy. I don't know. I am not too familiar with it. But he was telling me that if I didn't co-operate—"

After interruption by counsel and argument the appellant was permitted to continue as follows:

"Q. You may go ahead, Mr. Milow.

"A. Well, anyway after they brought me from this P Farm down there they said, 'Well, are you getting tired of doing time out here?' I said, 'No, it

ain't bothering me.' I said, 'I'd rather do 150 days out here than go back to that penitentiary and do anything.' So he said, 'Well, you can stay out here if you don't want to talk.' He said, 'This is just the beginning, because you are going to do 150 days out here and then after you get over to the County, we are going to make sure that you are sent over to the District Court, and that's going to take five or six months,' and this was back in February and I think the District Court had just went out then. And they come and got me again and said that they—

"MR. VAUGHN: Your Honor, I still don't know who 'they'—

"THE COURT: Sustained.

"A. Mr. Taylor and Moffit, and Don—whatever—three or four different days, picking me up. I don't know any of them personally, I just know them when I see them.

"Q. You know Mr. Taylor personally?

"A. I know Mr. Taylor personally, yeah. But he was usually with the guys, or at least one or two times when he come out to pick me up. And they kept on joking about 'We don't want to lose three days if he gets away,' and they would shocker me down and take me up here to this place up here and they would have somebody up there to say that I had did this and I had did that, but I still denied it. And I stayed out there 60 days eating twice a day beans and gravy, and I just got sick of it and I said, 'Well, if you are going to give me life anyway—they done assured me of that, and then if they would give me a one-to-five, I can verify this, he promised me one to five years if I would clean up—and I said, 'Well, I'd rather have a one-to-five than thirty to life—in prison."

The substance of further testimony by the appellant was that he did not take any items from the Johnson home, and he would rather confess and get one to five years than to get life imprisonment for something he did not do.

Where a person is on trial for a crime, evidence of a confession of guilt of the crime previously made by such person is in general not admissible unless it appears that the confession was entirely voluntary. If such confession is made while the party is under arrest or charged with a crime, evidence of the confession is not admissible on the trial unless it is made to clearly appear that the party was fully advised of his rights, and that after being so advised, the confession of guilt was freely and voluntarily made under circumstances that afforded no undue influence in procuring the confession. Furthermore, the burden of proof is upon the state to show that any confession of a crime by the accused was freely and voluntarily made *before the confession is admissible in evidence.* In this connection it is the duty of the trial court, before admitting the confession in evidence, to hear evidence and decide as a preliminary matter whether the confession was freely and voluntarily made without force or coercion. (*State v. Seward,* 163 Kan. 136,

181 P. 2d 478 [on rehearing, 164 Kan. 608, 191 P. 2d 743]; and *State v. McCarther,* 197 Kan. 279, 416 P. 2d 290.)

A situation similar to that in the instant case arose in *State v. Seward,* supra, where the trial court admitted a writing in evidence which constituted a confession, denying the defendant's counsel a right to show by witnesses that the offered writing was not a declaration against interest or the confession of the accused. The trial court advised counsel that his offer would be accepted when the defendant was putting on his case. The jury was thereupon called in and the witness permitted to identify the paper, whereupon the trial court overruled the objection and admitted the confession. In substance the trial court refused to consider, before overruling the objection to the confession, all of the evidence as to whether the confession was freely and voluntarily made without force or coercion. The court there reversed a conviction holding, among other things, it was the duty of the trial court, before admitting the confession into evidence, to hear evidence and decide as a preliminary matter whether the confession was freely and voluntarily made without force or coercion.

In the *Seward* case an extended discussion was undertaken analyzing cases from other jurisdictions concerning the burden of proof where a confession is offered in evidence, and instructions where a confession has been properly received in evidence. Reference is made to the *Seward* opinion as apropos to the situation at hand.

In *Andrews v. Hand,* 190 Kan. 109, 372 P. 2d 559, 371 U. S. 880, 9 L. Ed. 2d 117, 83 S. Ct. 152, it was said:

"Coercion in obtaining a confession from an accused can be mental as well as physical. (*Payne v. Arkansas,* 356 U. S. 560, 2 L. Ed. 2d 975, 78 S. Ct. 844; *Spano v. New York,* 360 U. S. 315, 3 L. Ed. 2d 1265, 79 S. Ct. 1202; *Blackburn v. Alabama,* 361 U. S. 199, 4 L. Ed. 2d 242, 80 S. Ct. 274.) The Fourteenth Amendment forbids 'fundamental unfairness in the use of evidence, whether true or false' (*Lisenba v. California,* 314 U. S. 219, 236, 86 L. Ed. 166, 180, 62 S. Ct. 280), and the range of inquiry as to whether a confession was involuntarily obtained is broad. Whether a confession was freely or involuntarily given is based upon consideration of 'the totality of the circumstances' (*Fikes v. Alabama,* 352 U. S. 191, 197, 1 L. Ed. 2d 246, 251, 77 S. Ct. 281), and 'where there is a genuine conflict of evidence great reliance must be placed upon the finder of fact.' (*Blackburn v. Alabama,* supra.) . . ." (p. 117.)

If the testimony of the appellant is to be given credence, it suggests a more sophisticated method of extracting a coerced confession by the police than resort to brute force.

The United States Supreme Court in another of a long line of

cases presenting the question whether a confession is properly admitted into evidence under the Fourteenth Amendment was confronted with a sophisticated method of extracting a coerced confession in *Spano v. New York*, 360 U. S. 315, 3 L. Ed. 1265, 79 S. Ct. 1202. The court there recognized, as in all such cases, that it was forced to resolve a conflict between two fundamental interests of society; its interest in prompt and efficient law enforcement, and its interest in preventing the rights of its individual members from being abridged by unconstitutional methods of law enforcement. The court there said:

". . . Because of the delicate nature of the constitutional determination which we must make, we cannot escape the responsibility of making our own examination of the record. *Norris v. Alabama*, 294 U. S. 587." (p. 316.)

· The court there found the use of the confession obtained inconsistent with the Fourteenth Amendment under traditional principles, saying:

"The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves. Accordingly, the actions of police in obtaining confessions have come under scrutiny in a long series of cases. Those cases suggest that in recent years law enforcement officials have become increasingly aware of the burden which they share, along with our courts, in protecting fundamental rights of our citizenry, including that portion of our citizenry suspected of crime. The facts of no case recently in this Court have quite approached the brutal beatings in *Brown v. Mississippi*, 297 U. S. 278 (1936), or the 36 consecutive hours of questioning present in *Ashcraft v. Tennessee*, 322 U. S. 143 (1944). But as law enforcement officers become more responsible, and the methods used to extract confessions more sophisticated, our duty to enforce federal constitutional protections does not cease. It only becomes more difficult because of the more delicate judgments to be made. . . ." (p. 320, 321.)

The points suggested by the record in the instant case were squarely considered by the United States Supreme Court in *Jackson v. Denno*, 378 U. S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774, 1 A. L. R. 3d 1205. In *Andrews v. Hand*, supra, the Kansas court in capsule form (heretofore quoted) has recognized the rules upon which the United States Supreme Court elaborated in considerable detail in *Jackson v. Denno*, supra. It there held the procedure in the state of New York to determine the voluntariness of a confession violated the due process clause of the Fourteenth Amendment to the Federal Constitution.

Under New York procedure, concerning a determination of the voluntariness of a confession offered by the prosecution, the trial court excludes it if under no circumstances could the confession be deemed voluntary, but leaves to the jury the ultimate determination of its voluntary character, as well as its truthfulness, if the evidence presents a fair question as to its voluntariness. In a prosecution for murder in *Jackson v. Denno*, supra, a New York state court in compliance with the foregoing procedure submitted to the jury, along with other issues, the question of the voluntariness of a confession obtained from the petitioner while he was hospitalized and after he had been given doses of demerol and scopolamine. The petitioner was convicted and his conviction affirmed by the New York Court of Appeals, the United States Supreme Court denying certiorari. Later his petition for habeas corpus was denied in the United States District Court for the Southern District of New York (206 F. Supp. 759), and the Court of Appeals for the Second Circuit affirmed (309 F. 2d 573). On certiorari the United States Supreme Court reversed and remanded the case to the district court. In the opinion the court said:

"It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, *Rogers v. Richmond,* 365 U. S. 534, and even though there is ample evidence aside from the confession to support the conviction. *Malinski v. New York,* 324 U. S. 401; *Stroble v. California,* 343 U. S. 181; *Payne v. Arkansas,* 356 U. S. 560. Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession. *Rogers v. Richmond, supra.* In our view, the New York procedure employed in this case did not afford a reliable determination of the voluntariness of the confession offered in evidence at the trial, did not adequately protect Jackson's right to be free of a conviction based upon a coerced confession and therefore cannot withstand constitutional attack under the Due Process Clause of the Fourteenth Amendment. . . ." (pp. 376, 377.)

Specific reference is made to the opinion in *Jackson v. Denno*, supra, for the detailed analysis and reasons assigned for the foregoing rule. In the opinion the court said:

". . . the reliability of a confession has nothing to do with its voluntariness—proof that a defendant committed the act with which he is charged and to which he has confessed is not to be considered when deciding whether a defendant's will has been overborne. . . .

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"It is now inescapably clear that the Fourteenth Amendment forbids the

use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will,' *Blackburn v. Alabama*, 361 U. S. 199, 206-207, and because of 'the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' *Spano v. New York*, 360 U. S. 315, 320-321. . . ." (pp. 384-386.)

The court went on to say under the New York procedure, the evidence given the jury inevitably injects irrelevant and impermissible considerations of truthfulness of the confession into the assessment of voluntariness, and that it is only a reliable determination on the voluntariness issue which satisfies the constitutional rights of the defendant and which would permit the jury to consider the confession in adjudicating guilt or innocence.

The court posed the question whether uncertainty about the sufficiency of the other evidence to prove guilt beyond a reasonable doubt will actually result in acquittal when the jury knows the defendant has given a truthful confession. The court then said:

"It is difficult, if not impossible, to prove that a confession which a jury has found to be involuntary has nevertheless influenced the verdict or that its finding of voluntariness, if this is the course it took, was affected by the other evidence showing the confession was true. But the New York procedure poses substantial threats to a defendant's constitutional rights to have an involuntary confession entirely disregarded and to have the coercion issue fairly and reliably determined. These hazards we cannot ignore.

"As reflected in the cases in this Court, police conduct requiring exclusion of a confession has evolved from acts of clear physical brutality to more refined and subtle methods of overcoming a defendant's will.

" '[T]his Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition. A number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of "persuasion." ' *Blackburn v. Alabama*, 361 U. S. 199, 206.

"Expanded concepts of fairness in obtaining confessions have been accompanied by a correspondingly greater complexity in determining whether an accused's will has been overborne—facts are frequently disputed, questions of credibility are often crucial, and inferences to be drawn from established facts are often determinative. The overall determination of the voluntariness of a confession has thus become an exceedingly sensitive task, one that requires facing the issue squarely, in illuminating isolation and unbeclouded by other issues and the effect of extraneous but prejudicial evidence. See *Wilson v. United States*, 162 U. S. 613; *United States v. Carignan*, 342 U. S. 36; *Smith v.*

*United States,* 348 U. S. 147. Where pure factual considerations are an important ingredient, which is true in the usual case, appellate review in this Court is, as a practical matter, an inadequate substitute for a full and reliable determination of the voluntariness issue in the trial court and the trial court's determination, *pro tanto,* takes on an increasing finality. The procedures used in the trial court to arrive at its conclusions on the coercion issue progressively take on added significance as the actual measure of the protection afforded a defendant under the Due Process Clause of the Fourteenth Amendment against the use of involuntary confessions. These procedures must, therefore, be fully adequate to insure a reliable and clear-cut determination of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend. In our view, the New York procedure falls short of satisfying these constitutional requirements. . . ." (pp. 389-391.)

In *Lynumn v. Illinois,* 372 U. S. 528, 9 L. Ed. 2d 922, 83 S. Ct. 917, it was held that in determining the voluntariness of a confession of crime, the question in each case is whether the defendant's will was overborne at the time of confession; if so, the confession cannot be deemed the product of a rational intellect and a free will. It was further held even though there may have been sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of a coerced confession vitiates the judgment because it violates the due process clause of the Fourteenth Amendment. *Payne v. Arkansas,* 356 U. S. 560, 2 L. Ed. 2d 975, 78 S. Ct. 844, is to the same effect.

In *Blackburn v. Alabama,* 361 U. S. 199, 4 L. Ed. 2d 242, 80 S. Ct. 274, it was said:

". . . A prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror. Thus the range of inquiry in this type of case must be broad, and this Court has insisted that the judgment in each instance be based upon consideration of '[t]he totality of the circumstances.' *Fikes v. Alabama,* 352 U. S. 191, 197." (p. 206.)

In view of the foregoing authorities it is clear the trial court denied the appellant in the instant case an adequate proceeding separate and apart from the jury to determine, as a preliminary matter, whether the confession was freely and voluntarily made by the appellant under circumstances that afforded no undue influence in procuring the confession. The range of inquiry in the collateral proceeding conducted by the trial court was limited, and the inquiry was based upon considerations far less than the totality of the circumstances. Whereas, the range of inquiry in such collateral proceeding by the trial court should have been broad, and the in-

quiry should have been based upon a consideration of the totality of the circumstances.

Certainly, where a trial court is obligated to consider the totality of the circumstances in determining whether a confession is voluntarily given, more is embraced than simply hearing the state's evidence, or only a part of it, in making such determination. Here the trial court in the collateral proceeding refused to permit counsel for the appellant to call Detective Andrew Taylor, who had interrogated the appellant on occasions prior to the taking of the taped confession, and the trial court also denied the appellant a right to testify, holding that the appellant's testimony was defensive matter for the jury to hear and determine at the proper time.

Under Kansas law, after a confession is admitted into evidence as being voluntary, the question of voluntariness is not open for the jury to consider, and a trial court does not err in refusing to give an instruction on the issue of voluntariness. (*State v. Robinson,* 182 Kan. 505, 322 P. 2d 767; and *State v. Freeman,* 195 Kan. 561, 408 P. 2d 612, cert. den. 384 U. S. 1025, 16 L. Ed. 2d 1030, 86 S. Ct. 1981.) The trial court has a duty, however, after deciding that a confession has been voluntarily made, and admitted into evidence, to instruct the jury that it should consider the truth or falsity of the confession along with the other evidence in the case (*State v. Seward,* supra), and evidence bearing upon the credence to be given a confession is admissible. (K. S. A. 60-408.)

To the extent that Syllabus ¶1 and the corresponding portion of the opinion in *State v. Jones,* 198 Kan. 30, 422 P. 2d 888 (followed in *State v. Phinis,* 199 Kan. 472, 430 P. 2d 251), is inconsistent with the law stated in this opinion, as exemplified in Syllabus ¶3, it is disapproved. The statutory law of this state, as construed by our decisions, must yield when it is not in harmony with rights guaranteed to our citizens by the Fourteenth Amendment to the Federal Constitution as interpreted by the United States Supreme Court. (See, K. S. A. 60-408.)

We turn now to a consideration of the disposition of this case. Since the appellant has not been given an adequate hearing upon the voluntariness of his confession, he must be given one.

This is not a case where the facts concerning the circumstances surrounding the confession are undisputed, and the task is only to judge the voluntariness of the confession based upon the clearly established facts in accordance with proper constitutional standards. Here there are substantial facts in dispute. Whether the appellant

is entitled to relief depends upon how these facts are resolved, for if the witnesses for the state are to be believed we cannot say the appellant's confession was involuntary, whereas if the appellant's version of the facts is accepted the confession was involuntary and inadmissible.

At this point the appellant has not yet had an adequate evidentiary hearing productive of reliable results, to which he is constitutionally entitled, concerning the voluntariness of his confession. It does not follow, however, that he is automatically entitled to a complete new trial including a retrial on the issue of guilt or innocence. His position before the trial court, and here, is that the issue on the admissibility of his confession should not have been decided by the trial court summarily, or by the convicting jury, but should have been determined in a proceeding separate and apart from the jury which determined his guilt or innocence. He is entitled to such a hearing in the trial court, but if at the conclusion of such a collateral evidentiary hearing on the issue of coercion, it is determined the appellant's confession was voluntarily given, admissible in evidence, and proper for the jury to consider, a new trial is unnecessary, because the appellant has already been tried by a jury with the confession placed before it and has been found guilty. Under these circumstances, if the conviction rested upon the confession there is no constitutional prejudice to the appellant. If the jury relied upon it, it was entitled to do so. On the other hand, if the trial court at a properly conducted collateral proceeding determines the facts upon all the evidence, and decides the appellant's confession was involuntary, there must be a new trial on the issue of guilt or innocence without admission of the confession into evidence. ( See, *Jackson v. Denno,* supra. )

Accordingly, the case is remanded to the lower court with directions to proceed in accordance herewith.